Our third case this afternoon is number 13-1527, WesternGeco L.L.C. v. ION Geophysical. Mr. Healy. Your Honor, you may please report. My name is David Healy and I represent ION Geophysical Geopelic. Two and a half years ago, we raised the problem that WesternGeco did not have an assignment or other ownership of these patents. We filed motions in the district court after going back and forth with them for several weeks. We filed a motion in this court. They control all the evidence. Dr. Biddleston still works for, whether it's WesternGeco or an affiliated company. They have the documents. They have everything. And yet in two and a half years, they've come up with nothing. There's one written assignment for each inventor. That written assignment is to Schlumberger Technology Corporation. That written assignment is filed in the patent office records. It is entitled to a presumption that that is the assignment that controls. And that assignment shows that this plaintiff had no authority and no standing and no jurisdiction in the court to pursue claims on the three Biddleston patents, which are really what the fight's about. That's where all the money is. That's the lost profits. It's entirely in the Biddleston patents. And even the bulk of the reasonable royalty are in the Biddleston patents. So as a practical matter, that's really where we are in terms of the relief that's needed for my client. And as a practical matter, if they had evidence that they were the assignee, that they own this patent, it would have come out in the last two and a half years since we first raised it. Well, I mean, there is a chain of title that they argued for that would give them the patent. Yes, Your Honor. And I think your opinion in this fine solutions case versus Newvasive, as well as your opinion Monday, in the Warsaw orthopedics case, bring up an important point here. And that is you can't just mush together corporate entities. In Warsaw Pact, we saw these corporate entities that carefully structured relationships that included various motivations in fine solutions. They were just mushed together. And in both cases, the court held that you could not just disregard the corporate structure. And what we have here is, if you look at their red brief, they say both inventors assigned... of the documentation, which says to me what I think, which is that this is a question of fact. Whether they have ownership of the title is a question of fact. And we review it under that standard. Is that not correct? Ordinarily so, Your Honor. But here, because the title, the chain of title is based on contracts, it's a question of law that's reviewed de novo. The inception of the chain of title is testimony. But that testimony doesn't even say who the contract's with. They say it was with GECO-PRACLA. There is no GECO-PRACLA as a standalone corporation. There are, in their cost-sharing agreements, seven companies named GECO-PRACLA. A UK company, an international company, and various others. There are nine companies, including a Norwegian company, and this happened in Norway with Mr. Hillison, named GECO. They don't even know, or they can't even take a position on who the assignment was made to, let alone what the assignment said, let alone what exactly was assigned. And as we've seen in the Stanford v. Roche case, that's critical here. They're saying the inventors had testified that they had agreements to assign the patents, and then there's a 1998 agreement, and there's a 2000 agreement, which seemed to transfer the patents. Let me address that quickly, because that is something that doesn't transfer the patents, and it doesn't for a few reasons. Which ones? Both the 1998 cost-sharing and 2000, let me address first, because they're worded almost the same. They almost look like a dupe and revise of each other. In those agreements, drafted under the Internal Revenue Code for some tax-sharing purpose, any member of the group can hold legal title, or any other person or nominee can hold legal title to the patent. It doesn't require transfer of legal title to whoever supposedly has the right to the patent. The second thing, Your Honor, is if you look at the termination clause, Schlumberger Limited, the head company in the Netherlands, they have the right to license anyone at any time, without restriction, and to terminate any participant. And when they terminate a participant, especially under the 1998 agreement, that participant loses all rights that they've been given, if any. At most, that agreement can do some kind of transfer of beneficial interest, but an assignment has to say it's an assignment, it has to transfer ownership, and it has to say who's getting the assignment. And that agreement doesn't say who's going to be the legal title owner. In fact, it says any number of people can be the legal title owner. It says that the person at the top of the chain can license at will and can take away your property or terminate your interest in the property at will. That's not a valid assignment in Section 261. No, Your Honor. I'm saying that under patent law, to have an assignment, it's a transfer of ownership. And one, it's got to be by the patent owner. And so if the patent owner was... The inventors say they did. The inventors say that when they started, and snippets of testimony that are very short, that that was their understanding, or that they signed something to that effect. Mr. Hillison said it was the GICO. Dr. Biddleston said GICO-PRACLA. That's a group of up to nine corporations. We don't even know who the assignee is. But also, if you recall the Stanford Roche case and other cases, how that assignment is phrased and what's assigned is important. And for example, Mr. Hillison testified that he was supposed to get some kind of bonus depending on how important the patent was. Well, they could have checked their records and at least seen which entity paid them the bonus. They could have seen, at least from the employment records, which entity hired who. Did you ask that question in discovery? No, Your Honor, because this was first learned after discovery for the reason that Western GICO, on the patents that went to trial, had filed the assignment, but in the cover pages, wrote that they were the assignee and the patents issued to Western GICO would be the assignee published on the cover page. So we have a presumption question, too. No, we don't, Your Honor. Your Honor, with all due respect, you can really only have one presumption at a time as to who owns it. And under Section 261, the assignment that's out of record is presumed to be the owner. That was in the SIRS case that I believe Judge Tite also was on. And we can't have, in the same lawsuit, I get a presumption that and they get a presumption that they own it. It's simply because by their own unilateral actions, they caused it to issue that way. Let's move on to F1 and F2. The jury was properly instructed with respect to F2 on the verdict form they found infringement under F2. And so quite apart from whether F1 has an intent requirement that wasn't recognized by the district court in the summary judgment motion or included in the F1 instructions doesn't really make any difference. I think it does, Your Honor, because this issue of whether this court had already decided that we were an infringer, which was based on no intent under F1, was something that was hotly disputed how and when the jury should be informed. And we wanted it to be done in the final instructions and in a way that was clear. So what's the error here? The error here is that we asked for an instruction. We did ask for it at the conclusion of the F1 instruction that made very clear they could not use the F1 findings in the summary judgment under F1 on F2. At all. I can read you the... I read it. It was too broad. The instruction you asked for was too broad because it would have barred them from considering the intent to have the thing assembled abroad. But what it didn't make clear, Your Honor, is that even assuming the F1 decision was correct, that we're talking about two different types of intent in the instruction. Yeah. I mean, if you'd asked for a narrower instruction, you might have an argument. But you asked for an instruction which basically said you can't mention the F1 summary judgment. I see I'm going into my rebuttal time, but I think, Your Honor, that looking at the motion in limine the argument over the instructions as a whole and the final instruction, it was clear we were just trying to make it so that the jury would see there was no way that they were permitted to use that F1 finding to find F2 liability. So if we reject that argument, we find that F2 liability was not infected by the disputes as to the F1 issue, then we can affirm without reaching the F1 issue, based on the finding of infringement with respect to F2. Well, Your Honor, we believe that... I understand, but that's hypothetical. We reject your argument that you should have had an instruction that they couldn't consider F1. We reject your argument about the limine motion. We reject your argument about counsel's argument. If that's all true, then we could sustain the judgment based on the finding of F2 liability without ever reaching F1, right? Your Honor, I disagree because of the change of the law that the Como opinion affected... No, I don't think you're answering my question. No, you could not, Your Honor, because under F2 or F1, we were entitled to raise... What was wrong with the F2 instruction? You didn't object to the F2 instructions, right? We didn't, but this was a change in the law that came along after. Well, what should have been instructed on F2 that he didn't? That he could have considered, and this is reflected in the Federal Circuit model during instructions that are in use now or available now, that you could consider a good faith belief in invalidity to be a good faith belief of no infringement. Okay. All right, we'll save your two minutes of rebuttal time. Thank you, Your Honor. May I please have the court's... So explain to me how you can get profits under U.S. patent law for profits made abroad? Sure, Your Honor. Under power integrations? Under power integrations, and I think what's an important distinction to start with is power integrations is a 271A case. This is a 271F case. But the question that presents itself in power integrations and in other cases is, is there an act of infringement? Step one. If there is an act of infringement, then we look at under 284 the harm to the patentee for that act of infringement, and it can be demonstrated, as they were in this case, they're available. The Congress has determined that for certain areas you can narrow the scope of damages available. I contend that what ION wants to do is say for 271F we're going to have a narrower scope, and they say as much in their briefs. You have to look at what's going on at the border. What does the component supplier under F make? Well, let's suppose this weren't a 271F case. It was just a case in which somebody sold a device that was shipped abroad and then used in a way that would infringe if it were in the United States. How can you get the profits that you would have made from the foreign activity? You can under 284 in the following scenario. So if this was 271A and I had made the entire apparatus here in the United States, or any apparatus, and shipped it abroad, the question becomes one, is there infringement? On your hypothetical, yes, under 271A. Then the question is what's the harm to the patentee under 284? What case says you can get foreign profits? You can get the fact that the impact on the patentee is extraterritorial. What case says that in my hypothetical about 271A you can get the foreign profits? On a 271A, whether you start with the sale of the kite or you then get to cases that follow on to that that say the location of the sale doesn't impact damages. So in Datascope, lost profits were available but they weren't proven. It's the only royalty that was granted there. What case deals with foreign profits? It says you can get foreign profits. It happens to be under 271F. There are several. Both in T.D. Williamson, lost profits were granted. Let's stay with 271A. What case says that if you sell something to the United States that's infringing it's shipped abroad and they're lost profits. You can recover the foreign lost profits. What case says that? In the SINCOR case, infringements under A and B and the court affirmed lost profits and a royalty where the defendants manufactured and sold the bus converters overseas. Were the lost profits in the United States or were they from foreign activity? The lost profits are to the patentee where the sale took place can be abroad. Under 271A, it's make, use or sell. Let's just focus on those three. If it's manufactured in the United States and sold in the United States or it's manufactured in the United States and sold abroad, still an act of infringement. Under 284, there's nothing that says if I'm the only maker of a product in the world, I make it, I have a U.S. patent and I sell both to U.S. customers and to Canadian customers and no one else makes it and then someone in this country makes that product here. What case under 271A says that if you sell something in the United States that is then used abroad to infringe a method claim that would be infringing due to lost profits on the use abroad. I mean, I'm not aware of a case. I'm not aware of a case that describes it in that manner, Your Honor. What I'd say is the cases that deal with foreign with the use of a product that has already been found to be infringing for a U.S. act of infringement, they don't distinguish and where it's, if ultimately the act of infringement happens in this country, this Court says and 284 says, you have to look at making the patentee whole regardless of where let's step back. Your question of what would happen if it was all in the United States versus abroad. If the harm to the patentee if the acts were solely in the U.S. would be clear. They would lose their profits and if you could prove them. If they sell some of those units in Canada instead of in the United States and I was previously selling to those because let's not forget I have to show but for causation that I lost that sale. Why am I not entitled to get those profits, Your Honor? So to be clear, your question of is there a case I can point to that specifically says for the ones that are made in the U.S. under A but then the customer for those sales was abroad. There actually is one I can think of where I know that's in the damages model. This Court in Seen and Thank. What case discusses that? No case discusses it in the manner you've asked, Your Honor. Okay. Now, but more importantly I think for this case 271F was created for a purpose and the purpose was to make the patentee in no different situation than if the infringement hadn't happened entirely in the United States and under 271F the whole premise is they ship components abroad and yet that's an act of infringement under the Patent Act and if Congress wanted to narrow that and say you have to stop at the border or you don't get lost profits they could have done so under 287. Congress specifically limits damages under 271G. There are also limitations certainly for markets and so You had a counterpart patent in France for example and the activity were in France that France could give a remedy for the foreign activity, right? In that situation I think you could choose your remedy but of course you could never get double compensation or double accounting. Who says? Well, I'd say it's a policy matter first off but there's nothing that suggests you have to What is it in the US patent law that says you can't get recovery both in France and the United States? It doesn't say that in the United States patent law. But so well, no I'd back up a step certainly it's not a patent only issue. There are cases from the Supreme Court Birdsell Glenair goes into this that you can't get double recovery. It's an election of remedies. Correct. And so the idea that it's whether it could be done let's also look at these patents. These are patents that are involved in looking for reservoirs on the high seas. Essentially you're in no one's country. So it's an apparatus that's shipped from the United States and does it abroad. There are US patents that cover that and they chose to manufacture these components Where was the contract entered into for the foreign activity? Well, the question that matters for 271F is the contract to sell components. You say that this happened on the high seas so it's not subject to anybody else's jurisdiction. Where was the contract entered into for an activity? They're each different depending on who the two sides the oil company on one side serving company and customers on the other side. Which under 271F if you supply components to be assembled or you cause them to be supplied you are an infringer. Well the contract to perform the services where were those contracts entered into? It's not I don't believe it's in the record, Your Honor. There were multiple jobs shown they were proven up. This wasn't an argument anyone made so there wasn't a debate over what law governs the particular contract, Your Honor. With respect to the premise of damages whether it's reasonable royalty or lost profits but at base the proper metric is harmed to the plaintiff. There's no argument by IOM that we have not suffered this harm. They went into it knowing indeed exactly what harm we would suffer. Not only on the intent side but specifically identifying the damages we've suffered. The suggestion we don't compete we're not entitled to lost profits. The jury heard all this evidence. JA8079 is their business plan. Their business plan specifically says only Western Geco has this technology. We're going to offer this technology. They say we don't have any intention to sell it to any other contractors ergo we're not going to license and they say today oil companies have no alternative to their Can I turn you to the assignment issue? When were these patents assigned? These patents were assigned to Western Geco in 2000 as part of the NSA and the TTA master formation agreement and tech transfer. They were assigned before. Why is there an assignment document in the record dated 2001 that's what you submitted in support of ownership  office? For the same reasons that ultimately the district court found. The 2001 assignment is both a confirmation of prior assignment and an assignment of any future rights. If it would have been a confirmation of an assignment to Geco or however you say it you would think that it would have actually assigned it to them but it didn't. Here's my problem with this assignment issue. It seems to me that you have perhaps a valid argument based upon chain of title. This guy worked for these companies by right of employment agreement or assignment in the past. He assigned those prior to this whole merger and everything where all these things were done. That's fine. That's not what you represented to the patent office when you  this is a valid assignment. That it's something else. There is an earlier assignment that the witness has testified to of their  This document is a confirmation of the assignment. It was represented to the patent office. But it's not a confirmation of the assignment because it doesn't reference the same party that you say they were assigned to. If we step back to the corporate form, this is a fact question. Are you saying that there's testimony that these were assigned to STC previously and then by operation of this merger that it went to GECCO? The testimony is they were assigned to their employer at the time, GECCO or Western GECCO, which is what it became called. And then there are documents that aren't suited in the record that have the transfer from GECCO. I have a hard time with this argument. Don't we generally prefer written assignment rather than substantiated testimony? I agree. Indeed, a written assignment is required. It's not a preference. And we don't have a written assignment documenting what you're saying. Here's what we have. And I think it's important to understand the context of why this is what we have. Let me ask you this. If there wasn't a prior assignment, if this is the assignment, this assignment is to STC, then all that previous corporate merger doesn't matter. That happened before this assignment to STC. So STC is the owner of the patent if we read this as the valid legal assignment. I don't agree. I think obviously you understand my view that there's an assignment before that, but it's your hypothetical. If that's the only assignment and there was no other, then the situation at hand would be were there the prior agreements in those agreements, did STC assign its rights at the time or in existence? And the language of the transfer to Western GECO from STC, this is the TTA as well as the MFA, and I'll note, I'll go back to it in a second, but the MFA, the Master Reform Instrument 2000, lists this patent. It actually lists this family of patents on it. Okay, but that's the problem. If that patent was assigned previously, then Dr. Biddleston had no property to assign in 2001. So that's another variant of saying that this 2001 document really isn't the effective assignment, but that's the problem. If we look at this as the effective document, I don't understand how any of that prior stuff relates to this document. Because the tech transfer agreement and the CSA refer to any rights that are obtained, or any rights in existence at the time. One says anything in existence, and one says any rights that are obtained. And so in the event that that was the scenario, and the district court judge, he said, I've looked at that, and it transfers anything they get their hands on. So that would cover it, even if it only came to them in 2001. The tech transfer agreement says anything in existence, and there's no debate the rights were in existence, it had been invented already, first off. And under the cost-sharing agreement, it would be because anything that they ultimately get in that space, and there's no debate it's in that space, was transferred. So it can be a transfer of anything I get. It's no different than an employee agreement. If I invent it later... So you're saying these cost-sharing agreement 2000 says any rights which are obtained, the tech transfer agreement says any IP in existence at the time. It doesn't matter who owns it, it's viable. Right, but that latter sentence can't be a transfer of this, or it would render this document ineffective, because if the IP was in existence at the time, and it was owned by one of those companies, then it wasn't owned by Dr. Biddleston. So he didn't have the authority to reassign it in 2001. I do see what you're saying, because it becomes a circular argument. It's inconsistent. It's completely inconsistent. The 2001 assignment relates to at some level it's probably a belt and suspenders exercise, but the context of why we have these agreements and those testimonies Although if you read the actual agreement it says, I have done so, or I will do so. It's referring to actions he has already taken, or the desire, the actual language of it says But he never made an assignment to Western Gecko. He did, his employment agreement, and he testified to this. He had assigned as of the nature of his employment for G. Co. Prackla. Both of these  are telling us to ignore this document when this is the very document you submitted to the patent office to show ownership. You didn't submit the chain of title argument to the patent office to show ownership. It would be on much firmer ground if you hadn't created this document, which I don't know how to describe it. This is not a situation where it's a non pro tonk assignment. This is years earlier in the course of a merger arrangement. There's no question that this is all one-ended. This is not a case where you have he or she owns it over here or he owns it over here. This is a corporate chain of events. The language of the assignment you're pointing to says this is J... It also says that he has the right to make the assignment. If he had already given it away, he didn't have the right to make that assignment. Can I make one more point on this? I think it's important to remember the context of why we're here and how we're in this situation. This was pled and never disputed that these patents were owned by Western GECO. The witnesses were deposed and they testified that they had signed it to their employer. And their argument at base is there's no best evidence. You don't have the best evidence. But their employer was not Western GECO. Their employer was GECO PRACLA. Which was a predecessor in interest. It is a predecessor. And the agreement in 1998 that the judge found when he looked at this, transferred it to STC, is from GECO PRACLA, Your Honor. So their employer was GECO PRACLA. There's no dispute about the testimony. It wasn't objected to. And the fact of the matter is that they had raised it. So the idea is that the judge had the desires of confirming its ownership of those rights. And it had those rights. So STC just confirmed its rights in 2001 that it owned the patent. It had been given those rights. And by everyone's agreement, there are multiple tech transfers from STC. I don't understand how what you meant was to reconfirm that Western GECO was the owner of the patent, which is what you put on the face of the patent application. This assignment didn't say Western GECO had that right. Here's the facts, and you can admit facts that ultimately control that decision. They did. But as another matter, a Jinimoto is a case in this court where the original transfer from the inventor doesn't exist. No one has it. But everyone knows they worked for the entity and there was no dispute that they worked there at the time and the testimony came in unobjected to and unrebutted as to who their owner is. So there's no best evidence argument. So I contend that at worst on the standing issue, it would be an issue that should be resolved factually. The district court judge did that. He was presented if they wanted other evidence or other discovery, the court said I've looked at your argument, I've looked at yours, I've looked at the witness testimony, I've looked at all the agreements and the underlying intervention. But he didn't address this in consistency. He did. The judge specifically addressed the argument of the 2001 assignment in his decision. It's J6 and 7 and 8. And he looked at this issue and he said there is the earlier cost-sharing agreement which would have assigned the rights they obtained. There's a question of whether or not it's clear error. It's not. We think it should be clear. Mr. Hewling? Your Honor, I'd just like to say two things about each of these points. First of all, to follow up on the assignment, the assignment does not mention Western Chico anywhere. Can you go back to the prejudice issue on the F2 versus the F1? Because it seems to me that that let's assume that the F1 instruction in the summary judgment was wrong because it didn't require some kind of intent. Explain to me again what the standard is for determining prejudice and why it's met here because you seem to concede that the jury was properly instructed on how to find infringement under F2. The prejudice, Your Honor, first of all, is the natural prejudice that any trial lawyer has experienced that the judge is telling the jury and the other side is allowed to tell the jury from beginning to end. So you've got that prejudice. Putting that aside, though, you've also got the prejudice that you're doing the same products, same transactions, same parties, same invoices, and they're not being told to keep these things separate. And the normal inclination of any lay person is if you're dealing with two things that are the same   not telling the jury to keep   separate, you're not telling the jury to keep these things separate, you're not telling the jury to keep separate. So you would dismiss the case as to the Biddleson patents. Can we send it back? Because it seems to me that the record is not sufficiently developed on this point. You raised it really late. And obviously you can raise it at any point in the proceedings but it certainly was raised really late. It does seem that there are inconsistent theories here but why wouldn't it be better given that you raised it so late to allow further argument on standing. There's two reasons your honor. First of all, the original patent in their name prosecuted in their name, fill out the cover pages in the records of the patent office in their name and to this day the database in the patent office shows that the parent patent is owned by STC. That is an attestation that this is a going forward assignment. The second thing, your honor, is there's no need to remand for this because Dr. Biddleston who signed this, he's the senior executive with these people. They could have just put in a declaration in response to our motions and said this is what happened, this is what I understood, I did sign something and they could have gotten some records to show who owned it. The PCT application is actually assigned to GICO AS, a Norwegian company, not GICO PROCLA. And that is in our jurisdiction. If you look at JA 01349, you'll see, actually, if you look at 13149, you'll see this was prosecuted by Schlumberger technology company, but the PTC application was first assigned to GICO AS and other GICO companies, but never to GICO PROCLA. Just as Mr. Hillison never testified he worked for GICO PROCLA, he said he worked for GECCO, which I'm assuming, since he worked in Norway, it was probably GECCO AS, but I don't know, there's nine companies that have the word GECCO in the name of  AS, but there's no case that says you can get damages for exploiting a U.S. patented invention outside of the U.S. for use of that. That has been the law in the U.S. for over 150 years since the Brown case in 1857, which was reaffirmed in Microsoft, power integration rejected this exact argument, and here, if they've been saying we made something overseas with these components, that somehow they were entitled to leapfrog from components to made, I don't know what would have happened, but their damages were for customers who were in the U.S. for years. Thank you. I appreciate your time. Since the cross-appeal wasn't addressed, there's no further rebuttal argument. The case is submitted. We thank both counsel.